Good morning, and may it please the Court, Christina Hellman for Petitioner Jeffrey Jones, and I plan to reserve about two minutes of my time for rebuttal. This morning I will first make three brief but critical points on the analysis of the Confrontation Clause violation under Lilly, and then I will turn to the Harmless Error analysis where I plan to spend the bulk of my time. Under Lilly, first, in this case, it's critically important to note that Tregeagle's statements are not, as the State argues, statements of sole responsibility. They are indeed classic statements under Lilly which shift and spread blame, in this case spread the blame, to a co-defendant. In this Court's case, Hernandez v. Small, this Court made a real good, very good distinction between blame-spreading statements and statements of sole responsibility, and in that case, the co-defendant had his statements were only harmful against Mr. Hernandez because of adding them in with other evidence at trial. On their own, they were just statements of what the co-defendant had did, and that's not what we have here. We have statements under Lilly, so the second point is that we know they're inherently unreliable, and that means that the State would have to point to something in the record that would show the statement itself overcomes that presumption. As the Supreme Court has said, that will be highly unlikely when the statements mirror those in Lilly, and that's what we have here. That presumption cannot be overcome. The statements, Tregeagle's statements introduced against Mr. Jones at his trial violated the Confrontation Clause. And finally, my third point, is that the question of reliability is not in a vacuum. It's not a general question of whether Tregeagle's statements were reliable. It's always assessed against the benefit of cross-examination. So the ultimate question would be, are the statements of Tregeagle so reliable in this case that confrontation would have basically been worthless, have had limited utility? And the answer is no, and we know that from the record, because Tregeagle gave conflicting statements. So that demonstrates that confrontation and cross-examination was critically necessary. Once we've established the confrontation violation, the question becomes, was that violation harmless? And again, this is very important to note, but the Supreme Court has set out a distinct test to analyze a harmless error. The question is not whether there's sufficient evidence of guilt to convict the defendant, even notwithstanding the error. The question is not whether the jury reached the right result. The Supreme Court has said, even if there's enough evidence left, you still want to look at the effect the error had on the trial. And so you're always going back to looking at that error, the fact that the confrontation right was violated, that the defendant was not able to cross-examine the co-defendant who gave the most damning testimony against him, and comparing that against the trial. You're right that it's not sufficiency of the evidence. It's, it's, is it, is it, what's the probability the jury would have reached the same verdict or not? And one thing that puzzles me as I look at this case and look at the verdict the jury returned is that why wouldn't the felony murder conviction or theory for conviction stand up anyway? I, I, I believe that the jury did find guilt on all of those charges, Your Honor. However, under Oregon law, what happened is that the convictions all merged into the aggravated murder charges. The, the, the magistrate judge had proposed sending it back with the usual certain number of days to retry, and it seemed to me that at a minimum, the Oregon court should be permitted to determine whether, based on the verdict that was returned by the jury, a conviction on a felony murder theory could stand, even if a conviction on aggravated murder might not. I, Your Honor, I believe that in a normal course where the, there were judgments entered on each 19 counts, and then the aggravated murder judgments were eliminated by the writ, the court would be left with the other judgments. However, the precise way in which this happened under Oregon law, under the law of merger, is that all of the remaining counts blended kind of into those six aggregated murder charges. And so the only thing that we have left, the only thing that Mr. Jones has been sentenced for and has a judgment entered against him for, are the six counts of aggravated murder. Well, but we do have a jury verdict for felony murder, and I don't want to take up all the time on this question, because it's a little bit of a tangent, but it seemed to me that, that the, the concern about Mr., what is it, Tregeagle? Tregeagle. Tregeagle. His testimony didn't speak to the felony murder theory, because even by your client's version, robbery was on the table. You might not have known that, that Tregeagle was going to, to use the gun and, and kill Schellenberger, but they were planning to take a car. And so it may be that the Oregon court has to sort that out, but I was just puzzled as to why it was that, that the conviction to be set aside entirely, because the felony murder theory seemed pretty sound. Yes, and, Your Honor, I think that your confusion would be, is understandable and would be correct to challenge what the magistrate judge had recommended in a normal course where, as I said, all of the counts were given a judgment. It's just the way that the Oregon court and the Oregon law works for merger that leaves us with only six aggravated murder counts of conviction. Judge, obviously, Judge Panner disagreed with the magistrate judge's recommendation. Now, what's wrong with Judge Panner's analysis as to why there was, why the error was harmless? The primary problem with Judge Panner's analysis is he focused solely on the evidence at trial and basically did a sufficiency analysis, saying there was enough evidence left to convict him. So he focuses, he says there's ample evidence, but then he focuses on three main factors. One, that Trey Geagle had informed Mr. Jones that he was going to kill somebody. Two, that Paul George, the witness, saw a commotion in the car. And three, that George's testimony conflicted with that of Mr. Jones. First of all, that's not ample evidence for the specific intent of aggravated murder, which requires more than mere presence at the scene. But more fundamentally, Your Honor, the problem is that Judge Panner did not engage in the analysis under Van Arsal and walk through the five factors to compare the effect of the error against the trial. He just looked at the remaining evidence, and that's the primary problem. Because when you look at the factors and you look at the effect of the error, you know that, number one, this was critically important testimony for the prosecution. It's relied on in opening statements, it's relied on in closing arguments, and it is relied on in rebuttal argument as one of the last things the jury hears before it goes to deliberate. Trey Geagle's statement linking Mr. Jones to the agreement to commit aggravated murder. It wasn't cumulative because nobody else testified about an intent or plan to commit aggravated murder, only Trey Geagle. And I'll note, too, this is also very important, that Trey Geagle's statements, the ones that the prosecutor will be able to testify about. Kennedy, you say no one else testified to Trey Geagle's plan to kill the driver? No. Jones did. He said, Trey Geagle, Jones, the defendant. He did, yes. Your client did, right. He did, and his testimony was that he had talked Trey Geagle out of it. You can disbelieve he tried to talk Trey Geagle out of it. He told such a phony story to begin with that he was, he told a witness the victim drove by with a car wash yelling, help me. And that caused the two defendants to enter the car. He gave a statement directly contrary to that to the police the same day. The story that he was trying to talk Trey Geagle out of killing the driver was not worthy of belief. Based on Jones's own statements. Your Honor, that is one way you could interpret it. But he did say, Trey Geagle told me he was going to kill someone before Trey Geagle killed anyone. Yes. And he didn't take a walk. He didn't ask for Trey Geagle to give him the gun. He got in the car with Trey Geagle after the statement was made by Trey Geagle that he was going to kill someone. True? All those facts are true. Those facts are all true, Your Honor. Yes. And I'll point out though, if you are saying that you would disbelieve Mr. Jones on part of that statement, the jury could also disbelieve Mr. Jones on all of it. Based on Trey Geagle's other statements. But your argument is that your client is unworthy of belief as to anything. Absolutely not. That's not my argument. I'm saying that under your theory, Your Honor, that the jury was entitled to disbelieve him. That also the jury would be entitled to disbelieve the first part that. No, they can believe what is bad against him and disbelieve what is good for him. That's classical. True. And the point I was going to make though is that we also do have conflicting statements from Trey Geagle that Mr. Jones didn't know. Didn't Jones say after the, I knew we shouldn't have gotten involved in a murder? Yes, that's true. Isn't that some pretty good evidence that he knew that they were going to commit a murder? Your Honor, my time's almost up. May I answer your question? You may, and my detour on felony murder took much of your time. So we'll still give you a minute for rebuttal. Thank you very much, Your Honor. Your Honor, that's one interpretation of that evidence, is that that was damning evidence against Mr. Jones. But there's another interpretation, and that is consistent with what Mr. Jones said, is that I talked Trey Geagle out of that. That's what I thought when we were getting in the car. And that this is, as I said, this is just a rueful confirmation of, look, I knew we shouldn't have done this, and that's what I told him. And I think that this precisely, Your Honor, is one of the important things to remember, is that then we're going back to the question of what was the effect of hearing from Trey Geagle through a police officer, and that's what the prosecutor relied on, that there absolutely was this explicit agreement between the two men. And that was not harmless error. Did you have one more question, Your Honor? No. Okay. Thank you. We'll hear from the State. May it please the Court, I am Patrick Ebbett for the Respondent, Superintendent Jeff Primo. The simplest reason why the District Court's decision should be affirmed in this case is because the disputed statements did not have a substantial injury. They did not have a substantial injury, but they did not have a substantial injury that would have a serious effect on the jury's verdict. This was not a simple contest of competing narratives with Trey Geagle's account on one hand and Petitioner's account on the other. Do you – does the State admit there was confrontational error? No, we don't. We submit that even under Lilly, the presumption – Lilly did not announce a per se rule. We're saying that the presumption in Lilly was rebutted due to the unique nature of Trey Geagle's statements in this case. Trey Geagle – this was a case in which Trey Geagle up front said, yep, I shot the guy, go ahead and electrocute me. But he spread the guilt by saying that Jones was not telling the truth when he said he didn't know that he intended, Trey Geagle intended to kill someone. He did. And any time you have a statement – To shift the blame, but he spread the blame, correct? He did spread the blame, but not in a way that diluted his own responsibility. And when we look at the cases that talk about spreading the blame – It didn't dilute his responsibility, but it didn't do anything to bolster it either. I mean, he's dead to rights, no question. Right. And he's acknowledged that fact. But even somebody who's caught red-handed – misery loves company. It's not – I'm not entirely bad. Somebody else did it, too. And that seems to be what's going on here. I mean, he wasn't fast to finger his accomplice, but what is it that makes that statement reliable? Well, I think we – Lilly talked about – when Lilly talked about the reasons for the presumption of unreliability, it – the Court talked about two things. One, attempting to somehow spread some of Curry – A1, perhaps, Curry favor. In other words, work a deal. And I think we saw some of that in, say, for example, Lee v. Illinois, where the accomplice was clearly trying to, you know, although he was perhaps the lead, he was clearly trying to work a deal with regard to Lee. Is your view that Tregeagle was saying, if I inculcate Jones, it will go easier on me? No. I'm saying that Tregeagle did not – I'm saying the presumption that that did not exist here. Tregeagle was – there was no evidence that one could even possibly infer that Tregeagle was trying to in any way work a deal. And I'm saying that's why the presumption – the basis for the presumption is not really operative here. Mr. Abbott, you started your argument by saying that there was no, under the Brecht test, a substantial and injurious effect, right? Correct. But, you know, that Tregeagle confession played a major part in both the prosecutor's opening statement and closing argument. He relied on it quite heavily in the closing argument, right? Doesn't that mean that the prosecutor thought, you know, it had a substantial – would have a substantial effect on the jury? The prosecutor relied on a lot of things. I mean, he relied – and one thing in particular the prosecutor came back to repeatedly was Petitioner's comment, I knew we shouldn't have gotten involved in a murder. I knew. And the prosecutor said in the opening statement, that's a confession. And in his closing remarks, the prosecutor analogized it to a comment such as, I knew I shouldn't have bet on the Packers. It was the analogy the prosecutor used. It indicates forethought. It indicates a decision was made to go forward with Tregeagle's plan to carjack and kill the victim. It was clearly a decision that he regretted, but it was a decision, it was a conscious decision that Petitioner made. And the prosecutor referred to that again on rebuttal. So this was a key part of the prosecution case. In these other cases where we talk about harmless error, we don't have essentially a confession by the Petitioner. And that wasn't all. The Petitioner's comments from the very beginning were indicated a certain amount of responsibility and a certain complicity with Tregeagle's plan. The first thing he says when he gets at the scene, he says he and Tregeagle were good Samaritans who had come across this scene. That indicates that he's standing with Tregeagle and he's engaging in a cover-up. After saying, I knew I shouldn't have gotten involved in a murder, he retreats from that and says, I didn't even know Tregeagle had a gun. I thought we were just getting into the car with the victim for a ride. However, on the witness stand, he retreats, he changes the story again. He says, I knew Tregeagle had a gun. I knew Tregeagle, Tregeagle told me of his plan to carjack and kill the victim. But I talked him out of it before we got in the car. When it was pointed out that he had, Tregeagle had announced an intent to kill someone for a car earlier, Petitioner said, oh, I thought he was singing along to a rap song. I didn't think he meant it literally. Petitioner's story didn't pass the laugh test in many ways. And when you combine that with his one non-completely self-serving statement, I knew we shouldn't have gotten involved in a murder, you don't have a credible, you have a whole lot of evidence that he knew exactly what was going on in this case. In addition, you had a statement where he said that his statements conflicted with the eyewitness accounts, two disinterested eyewitnesses whose statements incidentally corroborated each other. They both saw some sort of erratic driving in the car and some sort of struggle. All the knowledge that you point to about, you know, that a murder is going to or may be committed or awareness of that, you think is sufficient intent or mens rea for aggravated murder? Aggravated murder requires what? An intent to cause the death of another, right? Yes. And do you think that amounts to that kind of intent? I think the statement, I knew we shouldn't have gotten involved in a murder, indicates forethought. I knew I shouldn't we shouldn't have participated in a murder. I knew this was Trey Eagle's plan and I went along with it and now I regret it. Which shows knowledge that, you know, Trey Eagle is going to do it. So going along with it is sufficient? Going along with it is sufficient, yes. I mean, for the intentional state of mind? If you're an aider in a better, yes, you need intent that the result occur, but when you're going along with it, you're complicit in it, you know that's going to happen and you're helping in this carjacking and struggle, you don't have to be the actual trigger man to have that intent. By the way, speaking of trigger man, what's your view on the question Judge Clifton asked your opponent about, you know, the felony murder here, and, you know, does that suffice as an alternate basis to uphold the verdict? It would uphold the verdict on the felony murder counts and the kidnapping and robbery counts, yes. But not on the aggravated murder? Well, the aggravated murder is not felony murder. Aggravated murder requires proof of intent. Felony murder does not. And I think Judge Bea makes an accurate point when he points out that the gist of Petitioner's argument here is on intent. And that was certainly on remand. This Court has authority to fashion a flexible remedy in which it would say that habeas should only be granted on the aggravated murder and not the felony murder counts. Those counts were merged, but those counts could – the verdicts still stand at judgment time. They could be disentangled from the – Wait a minute. Repeat that again. You say the counts merged, but the separate verdict still stands? Is that what you said? The counts – on the judgment, the counts merged. But the jury's verdict still is still there. When – So, for instance, hypothetically, if we were to vacate the aggravated murder judgment, the felony murder verdict would still stand? That's my understanding of Oregon merger law, yes. I think it would involve some sort of disentangling the sort of demerging that occurred at the sentencing phase, but I think that's something the Oregon court presumably would have to deal with. Exactly, yes. Let me ask you one question. I'm going to take you over time, but I'm interested. The Petitioner's counsel criticized the route taken or test applied by the district court, noting in particular that the Supreme Court in Van Arsdale set forth five factors to consider. The district court's order was relatively brief and pointed toward just a couple of things. What's your understanding is the test that should be applied in determining whether or not the error here was harmless? Well, I mean, Van Arsdale was initially used in the constitutional error under the Chapman standard, and it has been used in this context as well. But I think if you apply the Van Arsdale factors, you end up in the same place as the district court did. I mean, importance of the witness testimony to prosecution, there was some – yes, the DA used this, but the DA also relied on a whole lot of other evidence, including Petitioner's own words, as well as the statements by the disinterested eyewitnesses that conflicted with Petitioner's statements. And the extent that it was cumulative, I submit that it was largely cumulative of, again, Petitioner's own words. I knew I shouldn't have got – we shouldn't have gotten involved in a murder. I think, obviously, there was no cross-examination here, and that would be a Van Arsdale factor that would weigh in favor of the Petitioner. But overall, the strength of the State's case was very strong, even independent of Petitioner's – of Tred Eagle's statements. I understand my time has expired. Thank you. Thank you for the argument. And we'll make both of you work a little over time today. As I said, we'll give the Petitioner a minute for rebuttal, because I used up a good chunk over time. Thank you, Your Honor. I have just two brief points in rebuttal. The first is on the remedy. And just to point out that the remainder counts, even though jury verdicts were entered on them, those counts were dismissed. So, yes, this is something that the Oregon courts would have to deal with on a remand. And should the court want, I'm sure that myself and opposing counsel could submit a supplemental brief addressing the merger issue by Friday. The second thing involves the reliance on Petitioner's statement. I knew we shouldn't have gotten involved in a murder. And the issue with that is that, unlike Tred Eagle's statements, which were – I said to Jones, are you down for me even if I shoot someone? And he said, yes, I'm down for you. That statement is susceptible – Mr. Jones's statement is susceptible to competing interpretations. And the effect of hearing one's – hearing that the co-defendant specifically implicated someone in a murder, that is going to influence the jury. That statement, Tred Eagle's statement related through the law enforcement officer, the question is of one of influence. That makes Mr. Jones's statement read one way versus the other. It makes the rest of the evidence in the case read one way versus the other. It absolutely influenced the jury's verdict. Thank you. Thank you. We thank both counsel for your helpful arguments. The case just argued is submitted.
judges: Tashima, Clifton, Bea